E-FILED on____3/16/12_____

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RSI CORP., dba RESPONSIVE SYSTEMS COMPANY, a New Jersey corporation,<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION; and DOE DEFENDANTS 1-20,<br><br>Defendant. | No. 5:08-cv-03414 RMW<br><br>ORDER DENYING MOTION FOR PROTECTIVE ORDER AND SANCTIONS PERTAINING TO RETALIATION AGAINST AND COMMUNICATION WITH EXPERTS<br><br>[Re Docket No. 103] |

Plaintiff RSI Corporation moves for a protective order and sanctions pertaining to alleged retaliation against and communication with one of its designated expert witnesses. For the reasons below, the court denies the motion.

## I. BACKGROUND

This action arises out of a soured business relationship between plaintiff RSI Corporation ("RSI") and defendant International Business Machines Corporation ("IBM"). In the mid-1990s, IBM licensed from RSI a product called the "Buffer Pool Tool" ("BPT") that is used in conjunction with IBM's DB2 mainframe database software. In 2001, IBM developed a product called the "Buffer Pool Analyzer" ("BPA") that was similar to the BPT. RSI alleges that IBM convinced customers to acquire its competing technology based in part on misrepresentations concerning the comparison of the two products. In 2008, RSI filed this suit, asserting claims for breach of contract, unfair competition and false advertising under the Lanham Act, state law unfair competition and tortious interference with prospective advantage.

One of the issues in dispute is whether IBM's statements regarding the comparison between BPT and BPA were knowingly false and misleading. According to RSI, this is a highly technical inquiry, requiring the "expertise of someone experienced with relational database management systems such as DB2 … and the tuning of buffer pools in those systems." Dkt. No. 103 at 3. RSI further contends that the group of individuals with such knowledge is "very small," and that because DB2 is an IBM product, anyone familiar with the technology in question necessarily has "some connection to IBM." *Id.* at 4.

**A.     Designation of Martin Hubel as an Expert**

Upon the commencement of discovery, the parties entered into a Stipulated Protective Order (the "Protective Order") providing that if a party seeks to disclose any documents identified as "Highly Confidential" to a designated expert, the other side must be advised of the designation and given 15 days to object. In preparation for a mediation in October 2011, RSI designated Martin Hubel, an independent consultant with experience in relational database management systems such as DB2, to review IBM's confidential materials and prepare a report comparing BPT to BPA. Shortly before the expiration of the 15-day window, IBM objected to the designation of Mr. Hubel because of his existing contractual obligations to IBM. *See* Dkt. No. 106 at 3.

Specifically, IBM noted that Mr. Hubel had participated in the "IBM Gold Consultants" program since 1994. *Id.* Gold Consultants take part in meetings and teleconferences sponsored by IBM, offer feedback on upcoming IBM technology, and aid in the design and implementation of

ORDER DENYING MOTION FOR PROTECTIVE ORDER AND SANCTIONS PERTAINING TO RETALIATION AGAINST AND COMMUNICATION WITH EXPERTS—No. 5:08-cv-3414 RMW (EDM)
2

1  database products. *See id*; Dkt. No. 103 at 5.  Space in the Gold Consultants program is limited, and
2  participation is at IBM's sole discretion.  Jimenez Decl. ¶ 3.  As a condition of his status as a Gold
3  Consultant, Mr. Hubel was required to sign a Confidential Disclosure Agreement prohibiting the
4  disclosure of information acquired in the program.  *See* Jimenez Decl., Ex. A.  While RSI indicates
5  that the information provided to Gold Consultants generally does not involve the technology at issue
6  in this litigation, IBM expressed concern that Mr. Hubel's standing as a Gold Consultant might have
7  provided access to proprietary information not subject to the Protective Order.  *See* Dkt. No. 103 at
8  5; Dkt. No. 106 at 4.

9  Ultimately, IBM agreed to disclose its confidential documents to Mr. Hubel solely in
10 connection with the mediation.  Dkt. No. 106-2 (Commerson Decl.) ¶ 13.  After reviewing the
11 documents, Mr. Hubel prepared a report describing the differences between BPT and BPA.  Hubel
12 Decl. ¶ 7.  According to Mr. Hubel, his involvement in the litigation terminated with the mediation,
13 which ended unsuccessfully on October 11, 2011.  *See* Jimenez Decl., Ex. B.

14 **B.     Alleged Retaliation Against Mr. Hubel**

15 On October 10, 2011, Teresa Jimenez, the manager of the Gold Consultants program, sent an
16 email inviting all Gold Consultants to attend three teleconferences in preparation for IBM's annual
17 Information on Demand ("IOD") conference in Las Vegas, Nevada.  Jimenez Decl. ¶ 8.  Mr. Hubel
18 indicated that he planned to attend.  *Id.*  Shortly after the conclusion of the mediation, Ms. Jimenez
19 sent Mr. Hubel an email stating that "given the litigation that you are involved in with IBM, I must
20 ask you not to participate in the calls."  Jimenez Decl., Ex. B.  She notes that the decision to prevent
21 Mr. Hubel's participation was made "in consultation with IBM's attorneys."  Jimenez Decl. ¶ 10.  In
22 response, Mr. Hubel sent Ms. Jimenez an email stating that he was "surprised and disappointed" at
23 IBM's decision and that he was no longer involved in the litigation.  *Id.*, Ex. B.

24 Subsequently, IBM revoked Mr. Hubel's invitation to the "DB2 for z/OS Gold Consultant
25 Advisory Council Meeting."  *Id.* ¶ 11.  Again, the stated reason for the revocation was Mr. Hubel's
26 involvement in the RSI litigation.  *Id.*  According to Mr. Hubel, neither the Advisory Committee
27 Meeting nor the earlier teleconference addressed the technology at issue in the litigation.  Hubel
28 Decl. ¶¶ 10, 15.

ORDER DENYING MOTION FOR PROTECTIVE ORDER AND SANCTIONS PERTAINING TO RETALIATION
AGAINST AND COMMUNICATION WITH EXPERTS—No. 5:08-cv-3414 RMW (EDM)
3

In November 2011, the International DB2 Users Group ("IDUG") held a conference in Prague, Czech Republic. The IDUG conference is open to the public and is not sponsored by IBM. Hubel Decl. ¶ 16. Mr. Hubel planned to attend the conference, and signed up for a workshop that was purportedly open to all conference attendees. *Id.* ¶ 18. IBM—which apparently had some control over attendance at the workshop—states that the workshop was over-subscribed, so Gold Consultants and IBM employees were asked to give up their spaces to allow more customers to attend. Dkt. No. 106-1 (Reed Decl.) ¶ 5. On November 10, 2011, Mr. Hubel received an email from a United Kingdom-based IBM employee indicating that she had reallocated his seat at the workshop. *Id.* ¶ 21. Although there is some dispute as to the reason for Mr. Hubel's exclusion, the email from IBM's employee states that "since sensitive customer questions or information may come up in this workshop, we must excuse you from attending due to the current litigation against IBM." Hubel Decl., Ex. G.

In December 2011, RSI and IBM engaged in a series of communications regarding what RSI perceived as "retaliatory" conduct against Mr. Hubel. *See* Dkt. No. 103 at 9. RSI complained that IBM's conduct was "thwarting" its ability to retain expert witnesses, and requested that only IBM representatives to whom disclosure was necessary to defend this litigation be informed of Mr. Hubel's or any other expert's involvement. *Id.* In reply, IBM asked RSI's counsel to confirm whether Mr. Hubel would have any further role in the litigation. *See* Dkt. No. 104-8 (Shultz Decl.), Ex. H. IBM's counsel further stated that "IBM's relationship with Mr. Hubel in his capacity as a IBM Gold Consultant is irrelevant to the RSI litigation and is purely a matter between IBM and Mr. Hubel." *Id.* According to IBM, RSI ultimately indicated that it "still planned to use Mr. Hubel as an expert." Commerson Decl. ¶ 24.

On January 16, 2012, Ms. Jimenez advised Mr. Hubel that despite his statements to the contrary, RSI had informed IBM's litigation counsel that Mr. Hubel would continue to serve as an expert for RSI in connection with the litigation. Jimenez Decl., Ex. D. Therefore, Ms. Jimenez stated that Mr. Hubel's "participation in the Gold Consultants Program and all associated activities is terminated effective immediately." *Id.*

ORDER DENYING MOTION FOR PROTECTIVE ORDER AND SANCTIONS PERTAINING TO RETALIATION AGAINST AND COMMUNICATION WITH EXPERTS—No. 5:08-cv-3414 RMW (EDM)
4

1   On February 10, 2012, RSI filed the instant motion seeking a protective order prohibiting
2   IBM from: (1) retaliating against any individual, including Mr. Hubel, who RSI may seek to
3   designate as an expert to whom documents identified by IBM as "Highly Confidential" may be
4   disclosed; (2) disclosing any confidential information pertaining to this litigation or information
5   disclosed pursuant to the Protective Order when such disclosure is not reasonably and directly
6   necessary for IBM's defense of this litigation; and (3) conducting improper communication with
7   experts disclosed by RSI. *See* Dkt. No. 103 at 18. In addition, RSI requests that sanctions be
8   assessed against RSI in the amount of $7,500 for the fees and expenses incurred in communicating
9   with Mr. Hubel regarding IBM's conduct and drafting the instant motion.

## II. DISCUSSION

11  Fed. R. Civ. P. 26(c) provides that "the court may, for good cause, issue an order to protect a
12  party or person from annoyance, embarrassment, oppression, or undue burden or expense." The
13  court "has broad discretion to decide when a protective order is appropriate and what degree of
14  protection is required." *Contratto v. Ethicon, Inc.*, 227 F.R.D. 304, 308 (N.D. Cal. 2005) (internal
15  citation omitted).
16  Here, RSI points to various conduct by IBM justifying the imposition of a protective order
17  and sanctions, including: (1) allegedly improper ex parte communications between IBM and Mr.
18  Hubel; (2) the disclosure of Mr. Hubel's identity as an expert witness to IBM employees; and (3)
19  purportedly retaliatory conduct intended to intimidate or harass Mr. Hubel. The court examines
20  each allegation in turn.

21  **A.    Improper Communications with Mr. Hubel**

22  RSI first argues that it was improper for IBM employees—including Ms. Jimenez—to
23  communicate with Mr. Hubel regarding his involvement in this litigation. Relying on *Erickson v.*
24  *Newmar Corp.*, 87 F.3d 298 (9th Cir. 1996), RSI contends that all communications with experts
25  appointed by RSI "must be stopped." Dkt. No. 103 at 14.
26  In *Erikson*, a defense attorney held an ex parte communication with the plaintiff's expert
27  witness during which the attorney offered the witness employment in an unrelated case. When a
28  dispute over the propriety of the defense attorney's conduct arose, the plaintiff's other expert witness

ORDER DENYING MOTION FOR PROTECTIVE ORDER AND SANCTIONS PERTAINING TO RETALIATION
AGAINST AND COMMUNICATION WITH EXPERTS—No. 5:08-cv-3414 RMW (EDM)
5

declined to testify on behalf of the plaintiff, claiming that he "did not want to be involved in a case where 'the attorneys [were] bothering the witnesses.'" *Id.* at 300.

The Ninth Circuit found that the defense attorney's conduct was unethical under the Nevada Rules of Professional Conduct. *Id.* at 302; *see also Campbell Indus. v. M/V Gemini*, 619 F.2d 24 (9th Cir. 1980) (finding an ex parte communication that resulted in an expert witness' "switching sides" to be unethical). "More importantly," the court noted that defense counsel's actions "had a prejudicial effect on [the plaintiff's] ability to present his case." *Id.* at 302-03. First, the plaintiff believed he could no longer use the "tainted" witness because he "did not know what had transpired during the [ex parte] meeting." *Id.* at 302. Second, because the other expert declined to testify, the plaintiff was left without the benefit of expert testimony at trial. The court thus found that the plaintiff was entitled to a new trial, and instructed the district court to impose "appropriate sanctions and disciplinary action upon defense counsel." *Id.* at 304.

Unlike in *Erikson*, RSI does not allege that any IBM *attorney* communicated directly with Mr. Hubel. Instead, the communications at issue were initiated by IBM business personnel and in reference to IBM-sponsored events Mr. Hubel sought to attend. While IBM concedes that the decision to exclude Mr. Hubel from Gold Consultants events was made "in consultation with IBM's attorneys," Jimenez Decl. ¶ 10, there is no evidence that IBM's counsel instructed Ms. Jimenez or any other IBM employee to contact Mr. Hubel or dictated the content of those communications. It is therefore unclear that IBM's conduct implicates the Rules of Professional Conduct or Federal Rules of Civil Procedure at all.[1]

---

[1] In its Reply brief, RSI argues that IBM's conduct breached the discovery rules because it allowed IBM to learn that RSI did not plan to retain Mr. Hubel's services as an expert witness beyond his involvement in the mediation. *See* Fed. R. Civ. P. 26(b)(4)(D) ("Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial."). Whether or not the information that Mr. Hubel would not continue to serve as an RSI witness is a "fact[] known or opinion[] held by an expert" subject to the strictures of Rule 26, the record makes clear that Mr. Hubel *volunteered* such information to IBM in an effort to reverse its decision regarding his status as a Gold Consultant. Rule 26 does not prevent a non-trial expert witness from voluntarily disclosing information to a party with whom he has a pre-existing relationship, and IBM cannot be penalized for Mr. Hubel's choice to share information that RSI would have preferred he keep to himself.

ORDER DENYING MOTION FOR PROTECTIVE ORDER AND SANCTIONS PERTAINING TO RETALIATION AGAINST AND COMMUNICATION WITH EXPERTS—No. 5:08-cv-3414 RMW (EDM)

1    Furthermore, in contrast to *Erikson*, RSI has not claimed that it can no longer use Mr. Hubel
2    as an expert witness due to the possibility that his testimony has been influenced by IBM.  In fact,
3    RSI appears to seek a protective order specifically so that Mr. Hubel can testify on its behalf.  Nor
4    does RSI contend that any other potential witnesses have been discouraged from testifying because
5    of IBM's actions towards Mr. Hubel.  Perhaps most importantly, RSI concedes that while
6    communications from IBM "referenced" Mr. Hubel's "involvement" in the litigation, there is no
7    evidence that any IBM employee discussed the substance of the litigation with Mr. Hubel or
8    attempted to influence his testimony in any way.  RSI has therefore failed to show that it has been
9    prejudiced by IBM's conduct.  *See Krzyzanowski v. Orkin Exterminating Co.*, No. 07-05362, 2009
10   U.S. Dist. LEXIS 113200 (N.D. Cal. Nov. 19, 2009) (finding *Erikson* inapplicable where the moving
11   party failed to show prejudice).  The court therefore concludes that RSI has not shown that IBM or
12   its employees acted improperly in communicating with Mr. Hubel regarding his participation in the
13   Gold Consultants and related programs.
14   On the other hand, as the *Erikson* court warned, "attorneys must use their common sense to
15   avoid conduct which could appear to be an improper attempt to influence a witness who is about to
16   testify."  *Erikson*, 87 F.3d at 303.  If IBM's attorneys were to encourage contact with Mr. Hubel for
17   the purpose of influencing his involvement with this litigation, they would violate serious ethical
18   restraints.  Moreover, the court is conscious that given the small pool of experts available to testify
19   regarding the technology at issue and the likelihood that any such expert has a pre-existing
20   relationship with IBM, actions that could be perceived as punishment directed towards designated
21   witnesses may have a "prejudicial effect on [RSI's] ability to present [its] case."  *Id.* at 302-03.  The
22   court thus cautions IBM's attorneys to tread lightly in counseling their client regarding its dealings
23   with RSI witnesses going forward.
24   **B.    Disclosure of Mr. Hubel's Identity to IBM Employees**
25   RSI next implies that IBM violated the existing Protective Order by disclosing to its own
26   employees—particularly the U.K.-based employee who emailed Mr. Hubel regarding the
27   reallocation of his seat at the IDUG workshop—the fact that Mr. Hubel was purportedly acting as an
28   expert for RSI in this case.  However, while the Protective Order clearly restricts the dissemination

of "Highly Confidential" material *to* designated experts, nothing in the order precludes a party from disclosing the identity of an opposing party's expert witnesses to the party's own employees. *See* Commerson Decl., Ex. A (Stipulated Protective Order) ¶ 7.3. Further, as IBM accurately notes, expert designations are a matter of public record. As RSI fails to cite an order issued by this court or any other authority supporting its position, the court declines to find that the disclosure of Mr. Hubel's identity as an adverse witness within IBM was improper.

**C.      "Retaliation" Against Mr. Hubel**

Last, RSI contends that the revocation of Mr. Hubel's invitations to IBM events and cancellation of his Gold Consultant status amount to retaliatory conduct in violation of public policy. In support of this proposition, RSI cites *L'Orange v. Medical Protective Co.*, 394 F.2d 57 (6th Cir. 1968), in which a medical malpractice insurance company cancelled an insurance policy issued to a dentist after he testified under subpoena against another dentist, resulting in a verdict for which the insurance company was liable. The Sixth Circuit found that the insurance company's actions violated public policy, noting that:

> A member of the medical profession could hardly be expected to appear in court and testify for a plaintiff in any litigation if the penalty might be the cancellation of his own malpractice insurance. It manifestly is contrary to public policy to permit an insurance company to use policy cancellation as punishment against a doctor or dentist who appears as a witness to protect the rights of a plaintiff who has been wronged by another member of the profession. If the insurance industry can use the cancellation procedure to keep members of the medical profession from testifying as witnesses, malpractice litigation can be stifled.

*Id.* at 62.

Here, RSI does not identify any comparable public policy applicable to IBM's Gold Consultants program. Unlike malpractice insurance, involvement in the Gold Consultants program is a privilege revocable at will, not a professional necessity. Gold Consultants are invited by IBM to attend certain events, but have no reasonable expectation of unconditional participation in the program. Further, while Mr. Hubel indicates that he is "saddened" by the revocation of his status, he does not suggest that IBM's conduct has prevented him from practicing his profession. Jimenez Decl., Ex. D. Moreover, even if Mr. Hubel's exclusion from the Gold Consultants program has

ORDER DENYING MOTION FOR PROTECTIVE ORDER AND SANCTIONS PERTAINING TO RETALIATION AGAINST AND COMMUNICATION WITH EXPERTS—No. 5:08-cv-3414 RMW (EDM)
8

1  harmed his consulting practice—an allegation thus far unsupported by the record—such injury does
2  not render IBM's actions contrary to public policy because RSI has not shown that commercial
3  litigation will be "stifled" as a result. *L'Orange*, 394 F.2d at 62.  Thus, the court finds that *L'Orange*
4  is inapposite.

5       RSI also implies that IBM's proffered reason for excluding Mr. Hubel—that he might be
6  exposed to information that could be used against IBM in litigation—was a pretext for simply
7  penalizing him for his involvement with RSI.  RSI points out that other IBM "competitors,"
8  including RSI's principal, Joel Goldstein, have long been members of the Gold Consultants program.
9  *See* Dkt. No. 107 at 5.  RSI also notes that there is no evidence that "confidential and sensitive"
10 information pertinent to this litigation would be discussed at the events to which Mr. Hubel was
11 denied access.  *Id.*

12      While the court agrees that IBM's motives in terminating its association with Mr. Hubel may
13 be mixed, private entities are afforded wide latitude under the law in structuring their business
14 relationships.  In the absence of a public policy or contractual restraint, there is no authority
15 suggesting that courts have the power to require a private litigant to maintain a discretionary
16 association with any individual, let alone an adverse witness.  Simply put, if IBM wishes to
17 discontinue an at-will commercial relationship with someone who has elected to testify on behalf of
18 an opposing party, it generally may do so.

19      That is not to say that there can be no recourse available to RSI or Mr. Hubel.  To the extent
20 that IBM's conduct violated a written agreement with Mr. Hubel, he may have standing to bring a
21 breach of contract action against IBM on his own behalf.  Under certain circumstances, Mr. Hubel
22 may also be able to sue under a variety of state and common law theories.  Furthermore, as RSI
23 notes, numerous federal and state criminal statutes prohibit the intimidation of potential witnesses.
24 *See, e.g.*, 18 U.S.C. § 1512(b).  Moreover, as discussed above, were RSI to demonstrate that IBM's
25 conduct was likely to have a "prejudicial effect" on its ability to present its case, the court would be
26 more inclined to impose an appropriate sanction.  *Erikson*, 87 F.3d at 303.  Finally, insofar as RSI
27 seeks to bar "improper" communications with RSI experts by IBM's *attorneys*, the Rules of
28 Professional Conduct provide adequate guidance and penalties.  However, at this point, the court

ORDER DENYING MOTION FOR PROTECTIVE ORDER AND SANCTIONS PERTAINING TO RETALIATION
AGAINST AND COMMUNICATION WITH EXPERTS—No. 5:08-cv-3414 RMW (EDM)
9

finds that RSI has not shown good cause to impose an additional remedy, and therefore denies its motion for a protective order and sanctions.

### III. ORDER

For the above-mentioned reasons, RSI's motion for a protective order and sanctions pertaining to retaliation against and communication with experts is denied.

DATED: March 16, 2012

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge