1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RSI CORP., dba RESPONSIVE SYSTEMS COMPANY, a New Jersey corporation,<br><br>          Plaintiff,<br><br>          vs.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION; and DOES DEFENDANTS 1-20,<br><br>          Defendants. | CASE NO. 5:08-cv-3414 RMW<br><br>**ORDER GRANTING IN PART AND DENYING IN PART IBM'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART RSI'S REQUEST FOR A CONTINUANCE UNDER RULE 56(D)** |

   This action involves claims for breach of contract, unfair competition, tortious interference with prospective economic advantage, false advertising and trademark infringement arising out of a soured licensing relationship between defendant International Business Machines, Corp. ("IBM") and plaintiff Responsive Systems Co. ("RSI").  After more than four years of litigation, IBM moves for partial summary judgment, arguing that RSI's claims are barred by a limitations provision in the parties' contract, various state law statutes of limitation, and laches.  IBM also contends that RSI's claims for trademark infringement fail as a matter of law.  RSI opposes IBM's motions, and alternatively moves for a continuance under Fed. R. Civ. P. 56(d) to seek discovery it claims is necessary to respond to IBM's arguments.

   For the reasons below, the court grants in part and denies in part IBM's partial motions for summary judgment on RSI's claims for tortious interference with prospective advantage and

1

unfair competition.  The court also tentatively finds that: (1) IBM is not estopped from relying on the contractual limitations period with respect to RSI's claim for breach of the audit provision; and (2) laches bars RSI's trademark infringement claims for damages but not injunctive relief. However, the court defers for ninety days from the date of this order a final ruling on those two issues to allow RSI to conduct further discovery as to whether IBM affirmatively misrepresented its intention to comply with the audit provision or willfully infringed RSI's mark.

## I. BACKGROUND

Since 1985, IBM has sold a mainframe database product called IBM Database 2 ("DB2"), which large corporate clients use to manage complex information systems.  DB2 customers include banks, airlines, governmental agencies, insurance companies and other entities that store and process massive amounts of data.  Dkt. No. 142-4 (Goldstein Decl. CLP) ¶ 4.[1]

DB2's back-end uses "buffer pools," groups of memory locations allocated for temporary storage, to retain data while it is transferred from a computer's hard disk to the database application.  Dkt. No. 139-24 (Hubel Decl.) ¶ 6; Morgan Decl., Ex. B.  In the early 1990s, RSI developed a software product called Buffer Pool Tool ("BPT") to "tune" DB2's buffer pools, improving their performance and efficiency.  Hubel Decl. ¶ 6-8.  BPT was the first product of its kind and quickly met with success in the DB2 market.  *Id.* ¶¶ 8-10.  In 1995, RSI began licensing BPT directly to DB2 users.  Goldstein Decl. CLP ¶ 4.  RSI filed a trademark application for the mark "Buffer Pool Tool" on July 6, 1999, claiming its first use of the term in commerce on February 1, 1994.  Morgan Decl. COA, Ex. A.

### A.    IBM licenses BPT from RSI

On June 23, 1997, RSI and IBM entered into a three-part agreement (the "Developer Agreement") permitting IBM to license BPT to its DB2 customers in exchange for quarterly

---

[1]    The acronym "CLP" refers to declarations submitted in support of the parties' motions for summary judgment concerning the scope of the contractual limitations provision.  "COA" refers to declarations submitted in support of the motions for summary judgment on RSI's second and fourth causes of action.

2

1  royalty payments to RSI.  *Id.*, Ex. Z § 6.3.[2]  The agreement was a form contract drafted by IBM,

2  and the parties did not negotiate its "standard terms."  Goldstein Decl. CLP ¶ 11.

3       The developer agreement contains a number of provisions relevant to the instant motions.

4  First, it obligates IBM to provide RSI with a statement summarizing how each royalty payment is

5  determined (the "Royalty Provision").  *Id.*  Second, it requires both parties to maintain auditable

6  records to support invoices issued or payments made for three years following the date of the

7  related payment (the "Audit Provision").  Morgan Decl. CLP, Ex. Y § 3.6.  Third, it contains a

8  New York law choice of law provision (the "Choice of Law Provision").  *Id.* § 13.6.  Fourth, it

9  expressly permits both parties to "develop, acquire and market competitive items and services"

10 (the "Freedom of Action provision").  *Id.* § 3.2.  Finally, it provides that neither party will bring "a

11 legal action against the other more than two (2) years after the cause of action arose (the

12 "Limitations Provision").  *Id.* § 13.3.

13      In addition, the developer agreement gives IBM a non-exclusive right to use the BPT

14 trademark in its marketing materials.  Goldstein Decl. CLP, Ex. A § 3.2.  According to RSI,

15 because both parties planned to license the same product, they discussed how each company

16 would refer to the software before finalizing the contract.  Dkt. No. 140 (Goldstein Decl. COA) ¶

17 16.  IBM allegedly agreed to describe the "IBM-branded" software as "DB2 Buffer Pool Tool,"

18 while RSI would refer to its version as "Buffer Pool Tool for DB2."  *Id.*

19      On September 16, 1997, IBM publicly announced the availability of the DB2 Buffer Pool

20 Tool in a letter titled "IBM DB2 Buffer Pool Tool: Save $$$$."  Mink Decl., Ex. B.  Between

21 1998 and 2000, IBM referenced the DB2 Buffer Pool Tool in at least five other product

22 announcement letters and in additional IBM marketing materials.  *See Id.* Exs. D-G; Goldstein

23 Decl. COA, Ex. B.  The parties dispute whether any such materials "associated" the product with

24 RSI or acknowledged that "Buffer Pool Tool" was an RSI trademark.

25 **B.     IBM develops the "DB2 Buffer Pool Analyzer for z/OS" Product**

26 ──────────────────────────

27   [2]   The Developer Agreement consists of: (1) the "Base Agreement," (2) the "Description of Licensed Work," and (3) the "Statement of Work."  *See* Goldstein Decl. COA ¶ 15; *Id.*, Ex. A;

28 Morgan Decl. Exs. Y and Z.

3

By early 2000, IBM had decided to invest more heavily in its DB2 "tools" business.  Mink Decl. ¶ 8.  The following year, IBM informed RSI that it would no longer "actively market" the IBM-branded version of BPT to its DB2 customers.  *Id.* ¶ 12.  The impetus for this decision is the subject of some disagreement.  IBM contends that it had previously resolved to move from a monthly license charge ("MLC") model to a one-time charge ("OTC") model for DB2 tools products, and discontinued support for BPT only after RSI refused to adopt the new pricing structure.  *See id.* ¶¶ 8-11.[3]  RSI claims that the OTC model was its idea in the first place, and that IBM stopped pushing BPT in an effort to "take over" the market for buffer pool tuning software.  Dkt. No. 139 at 3.

On September 11, 2001, IBM announced the release of its own buffer pool tuning product, "DB2 Buffer Pool Analyzer for z/OS" ("BPA").  Mink Decl., Ex. I.  While it is unclear when BPA was developed, IBM's internal communications reveal some effort to choose a name for the new product that would not infringe RSI's trademark.  For example, although IBM had initially referred internally to the product as "Buffer Pool Tool," a June 7, 2001 email from an IBM employee states: "I think we might want to have a new name for the Buffer Pool Tool …. I believe [it] is a registered trademark of [RSI].  While we might be able to get around this by putting DB2 in front I think we're going to create confusion and, perhaps, mislead people."  Mink Decl., Ex. U.  Subsequent emails from other employees suggest the names "Buffer Pool Expert" and "DB2 Buffer Pool Analyzer."  *Id.*  It is not clear who made the final naming decision, or when that decision was made.  According to RSI, within the DB2 industry, IBM's product is often referred to as "BP Analyzer" or simply "BPA."  Goldstein Decl. ¶ 17.

On December 4, 2001, IBM issued a "Software Withdrawal" letter to its DB2 customers noting that effective March 4, 2002, it would no longer market the DB2 Buffer Pool Tool.  *Id.*, Ex.

---

[3]   RSI has moved to strike this and other portions of the Mink Declaration on the grounds that the declarant, DB2 executive Steve Mink, lacks personal knowledge or is repeating information allegedly told to him by others.  *See* Dkt. No. 144.  While the court agrees that some of RSI's objections have merit, rather than addressing each individually, the court will note factual disputes where they are relevant, and will not rely on inadmissible evidence in resolving the instant motions.

J.  The letter further indicated that the "DB2 Buffer Pool Tool" would be "replaced" by "DB2 Buffer Pool Analyzer for z/OS."  *Id.*

In response, RSI took immediate action to avoid losing market share to IBM.  Between September 2001 and February 2002, the company produced a number of materials purporting to demonstrate BPT's superiority to BPA, including: (1) an internal document entitled "Key Reference Points to Use Comparing the [RSI] Buffer Pool Tool Against the IBM Buffer Pool Analyzer," (2) a "White Paper" containing extensive technical comparisons between the two products, and (3) a "promotional piece" showing various BPT features lacking in BPA.  *See* Morgan Decl. COA, Exs. FF, JJ and II.

C.      **Alleged confusion between BPT and BPA**

Notwithstanding any differences between the products, there was some confusion over the source of BPT and BPA from the start.  In July 2001, an internal IBM email noted that BPA was "developed by [RSI] but has now been transferred to IBM."  Goldstein Decl. COA, Ex. L.  In February 2002, an IBM employee responded to another employee's question regarding a customer query by asking: "Did he mix up the new IBM … DB2 Buffer Pool Analyzer with the [RSI] Buffer Pool Tool which was previously marketed by IBM …?  We're servicing IBM's Buffer Pool Analyzer only."  Schultz Decl., Ex. D.  More than three years later, in June 2005, an IBM employee emailed RSI seeking clarification as to whether BPT and BPA are "one and the same."  Dkt. No. 139-25 (Levenstein Decl., Ex. A).  The following month, a customer contacted IBM looking for "info for db2 bufferpool tool," but later retracted his inquiry, noting that he "was able to find out that it is called analyzer now, not tool.  So was able to find out that it is a separate product."  Shultz Decl., Ex. U.  In addition, some of IBM's marketing materials, including a 2003 DB2 administration guide, a 2005 product announcement posting, and several DB2 installation guides, reference the term "DB2 Buffer Pool Tool" or "Buffer Pool Tool."  *See* Goldstein Decl. Exs. F-G, I-K.

While RSI was aware of the existence of BPA in 2001, it claims that it did not learn that IBM's customers were confused as to the source their tuning software until around 2005.  Goldstein Decl. COA ¶ 36.  RSI principal Joel Goldstein indicated that by that point, customers

who had obtained BPA from IBM as part of a DB2 tools "bundle" had begun to "approach[] [him] at trade shows or conventions to ask about their utilization of BPT." *Id.* ¶ 51-52.  In August 2006, a prospective customer responded to an email from an RSI sales agent, stating: "IBM's performance expert products were included in the suite and they contain the buffer pool tool for DB2.  So I think we are set on buffer pool tools for now."  Levenstein Decl., Ex. B.  Several other RSI sales representatives also indicated that prospective customers thought they already had BPT when they in fact had BPA.  *See* Dkt. No. 139-1 (Copson Decl.); Dkt. No. 139-3 (Donath Decl.); Dkt. No. 139-53 (Turner Decl.); Dkt. No. 139-54 (Walton Decl.).

In addition, a number of RSI customers apparently believed that BPT was an IBM product.  For example, a representative of the USDA, which is an RSI customer, emailed RSI in 2007 asking for help "trying to get the IBM Buffer Pool Tool to work properly."  Goldstein Decl. COA, Ex. O.  On September 29, 2010, a different USDA representative emailed RSI, stating: "Buffer Pool tool is an IBM product."  *Id.*, Ex. P.  In sum, declarations from RSI employees identify over thirty customers who have indicated that "they are confused between BPT and BPA and/or the identity of the creator of that software."  *See, e.g.*, Goldstein Decl. COA ¶¶ 47-51; Levenstein Decl., Ex. B.

RSI sales agents also claim that while the users of buffer pool tuning software are tech-savvy IT professionals, the purchasers of such products, who tend to be managers or executives, typically "do not know the difference between [BPT] and [BPA]."  *See, e.*g, Donath Decl. ¶¶ 9-11.  In addition, most purchasers allegedly "believe both products result in similar savings to their … companies."  Walton Decl. ¶ 10.  RSI asserts that such confusion hurts its business and the customers themselves, who are misled into buying an inferior product.  *See* Morgan Decl. COA, Ex. EE at 9.

**D.     RSI's initiation of audits under the developer agreement**

Meanwhile, although IBM stopped marketing BPT in the early 2000s, it remained obligated under the developer agreement to pay RSI royalties on outstanding BPT licenses.  In 2001, after noticing "discrepancies" in its royalty reports, RSI advised IBM that documents pertaining to the shipment of BPT and end-user capacity "would be needed for an audit to be

1   conducted." Goldstein Decl. ¶ 18.[4]  In June 2002, RSI formally notified IBM of its intent to

2   conduct an audit for the three-year period from June 1999 to June 2002.  *See id.*, Ex. G.  RSI

3   appointed Ivan Gelb ("Gelb") to be its independent auditor.  At IBM's request, on July 10, 2002,

4   Gelb signed a Confidential Disclosure Agreement ("CDA").  Goldstein Decl. CLP, Ex. H.  The

5   CDA provided that "[e]ach time [IBM] wishes to disclose [audit] information to [RSI] … [IBM]

6   will issue a supplement to this Agreement" containing deadlines for the disclosure of audit data.

7   *Id.* § 1.0.  The CDA was accompanied by such a supplement, setting a final disclosure date of

8   October 31, 2002.

9          According to RSI, IBM subsequently remitted $480,000 in underpaid royalties, but did not

10   provide the information required to complete an audit.  Goldstein Decl. CLP ¶ 23.  In January

11   2004, the parties formally extended the audit disclosure date until June 30, 2005.  *Id.*, Ex. N.

12   Towards the end of 2004, the parties began discussing a one-time payment to resolve all

13   outstanding audit issues, but in March 2005, IBM rejected RSI's settlement terms.  *See id.* ¶ 54,

14   Ex. M.  In the meantime, the parties maintained a prolonged email exchange during which RSI

15   repeatedly asked for confirmation of when audit data would be provided, and IBM consistently

16   responded that "we are working hard on it."  *See id.*¶¶ 26-40.  On May 25, 2005, an IBM

17   employee sent a "couple of spreadsheets" to Gelb, but noted that there was still more data to

18   gather.  *Id.* ¶ 41.  The parties again executed formal supplements to the CDA in 2005, 2006 and

19   2007.  *Id.*, Ex. N.  IBM eventually agreed to complete disclosure by October 2007.  *Id.*  In

20   September or October 2007, IBM indicated that it had "boxes of information it was ready to send

21   to RSI's auditor," but never produced the information.  *Id.* ¶ 58.  To date, IBM has not provided

22   complete audit data, nor has it repudiated its duty to do so.  *Id.* ¶ 57.

23                          **II. PROCEDURAL HISTORY**

24          RSI filed the instant action on February 15, 2008, alleging claims for (1) breach of

25   contract, (2) negligent misrepresentation, (3) intentional misrepresentation, (4) fraud, (5) bad faith,

26

27          [4]   Under the terms of the developer agreement, the capacity or size of the licensee affects the
     price of a BPT license.

28

7

1   (6) conversion, (7) violations of the Lanham Act, (8) common law unfair competition, and (9)

2   restraint of trade.  *See* Dkt. No. 1.  Several rounds of successful motions to dismiss and amended

3   complaints followed.  The Third Amended Complaint ("TAC"), which forms the operative

4   pleading for the purpose of the instant motions, asserts causes of action for (1) breach of the audit

5   provision and royalty provision of the developer agreement, (2) trademark infringement and false

6   advertising under the Lanham Act, (3) interference with prospective economic advantage, and (4)

7   unfair competition.  *See* Dkt. No. 82.  Under the TAC, RSI seeks lost profits, restitution for any

8   profits gained by IBM as a result of its allegedly wrongful conduct, punitive damages, and a

9   permanent injunction prohibiting IBM from infringing on RSI's intellectual property.

10   **III. ANALYSIS**

11   **A.      CONTRACTUAL LIMITATIONS PROVISION**

12        Under New York law, parties to a contract may agree to shorten the statute of limitations

13   for claims that arise between them.  *See* N.Y. C.P.L.R. § 201 ("[A]n action . . . must be

14   commenced within the time specified in this article unless . . . a shorter time is prescribed by

15   written agreement.").[5]  "Absent proof that the contract is one of adhesion or the product of

16   overreaching, or that [the] altered period is unreasonably short, the abbreviated period of

17   limitation will be enforced."  *Incorporated Village of Saltaire v. Zagata*, 280 A.D.2d 547, 547-548

18   (N.Y. Ct. App. 2001) (citation omitted).  A contractual limitations period may bar claims for

19   breach of contract, as well as tort claims.  *Corbett v. Firstline Sec., Inc.*, 687 F. Supp. 2d 124, 128

20   (E.D.N.Y. 2009).  However, such provisions must be "viewed cautiously and construed strictly

21   against the party invoking the shorter period."  *Chase v. Columbia Nat'l Corp.*, 832 F. Supp. 654,

22   659 (S.D.N.Y. 1993) (citations omitted).

23        The limitations provision in the developer agreement reads:

24        Except for actions brought to enforce Section 7.0, "INDEMNIFICATION AND
         LIABILITY," neither of us will bring a legal action against the other more than two
25        (2) years after the cause of action arose.

26   _____

27        [5]   RSI concedes to the application of New York law "for the purposes of this motion only."
     Dkt. No. 142 at 7.

28

Morgan Decl. CLP, Ex. Y § 13.3.  IBM argues that this clause bars *any* claim that arose more than

two years before the initiation of this action, including RSI's tort claims. RSI disagrees,

contending that the provision applies only to claims for breach of contract.  In addition, RSI

argues that IBM is estopped from invoking the limitations provision to bar its claim for breach of

the audit provision because of its "repeated and continuing promises, and requests for extensions

of time, to disclose auditable information."  Dkt. No. 142.[6]

     **1.**    **RSI's tort claims**

On its face, the limitations provision applies to any "legal action," not solely claims for

breach of contract.  However, the court finds that the clause should be construed to cover only

those claims that are closely related to the parties' contractual rights and  obligations.

First, when read in the context of the developer agreement as a whole, the scope of the

provision is ambiguous.  *See MBIA Inc. v. Fed. Ins. Co.*, 652 F.3d 152, 165 (2d Cir. 2011) ("We

must read a contract as a whole and construe terms in context.") (citation omitted).  A contract is

ambiguous where it is "reasonably susceptible of more than one interpretation." *Chimart*

*Associates v. Paul*, 66 N.Y.2d 570, 573 (N.Y. 1986).  A party seeking summary judgment has the

burden of establishing that the construction it favors "is the only construction which can fairly be

placed thereon." *Arrow Communication Lab. v. Pico Prods.*, 206 A.D.2d 922, 923 (N.Y. Ct. App.

1994) (citations omitted).  "In cases of doubt or ambiguity, a contract must be construed most

strongly against the party who prepared it, and favorably to a party who had no voice in the

selection of its language." *Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (N.Y. 1985).

The first page of the base agreement, in which the limitations provision is located, states

that the contract "covers … projects in which IBM may involve [RSI]."  Morgan Decl. CLP, Ex.

A at 1. The accompanying Description of Licensed Work makes clear that the only "project"

covered by the base agreement is the licensing of "code, documentation and any other related

written material for [RSI's] Buffer Pool Tool."  Goldstein Decl. CLP, Ex. A at 2.  The agreement

---

[6]   The court already determined that the limitations clause bars claims for breach of the
royalty provision based on "any nonpayments of royalty … that occurred before 2006."  Dkt. No.
70 at 4.

does not refer to any additional projects or services, or suggest that it applies to other aspects of the parties' relationship. Thus, it was reasonable for RSI to assume that the limitations provision would apply only to claims arising out of the licensing of BPT. *See BP A.C. Corp. v. One Beacon Ins. Group*, 8 N.Y.3d 708, 716 (N.Y. 2007) ("The reasonable expectation and purpose of the ordinary business [person] when making an ordinary business contract will be considered in construing a contract."). Moreover, the choice of law provision indicates that "the substantive laws of the State of New York *applicable to agreements* fully executed and performed in New York govern the [developer agreement]." Morgan Decl. CLP, Ex. A § 13.6 (emphasis added). This language suggests that disputes between the parties will be subject to New York contract law, supporting RSI's contention that the only "legal actions" covered by the limitations provision are contract claims.

IBM argues that the term "legal action" is "broad, but not ambiguous," relying on *Mill-Bern Assocs. v. IBM*, 64 Fed. Appx. 792, 794 (2d Cir. 2003). *Mill-Bern* addressed the issue of whether a letter sent by the plaintiff could constitute a "legal action" sufficient to toll the limitations period, not whether the agreement covered claims arising outside the parties' contractual relationship. *See id.* (finding that the unambiguous definition of a "legal action" is "a lawsuit brought in a court"). While the court agrees that the definition of "legal action" is clear, the *kinds* of legal actions governed by the limitations provision are not. *Mill-Bern* thus does not control this case. Construing the limitations provision "most strongly" against IBM as the drafting party, the court interprets the clause to apply only to claims that bear some substantial nexus to the developer agreement. *Jacobson*, 66 N.Y.2d at 993.

IBM's cited authorities are in accord. For example, in *Corbett v. Firstline Sec., Inc.*, the parties entered into an "Alarm Services Contract" that provided for the "installation and/or monitoring" of an electronic security system. *Corbett*, 687 F. Supp. 2d at 126. The agreement contained a limitations provision stating: "YOU AGREE TO FILE ANY LAWSUIT OR OTHER ACTION YOU MAY HAVE AGAINST US … WITHIN ONE (1) YEAR FROM THE DATE OF THE EVENT THAT CAUSED THE LOSS, DAMAGE OR LIABILITY." *Id.* The plaintiff's alarm system soon malfunctioned, and her home was burglarized. The court held that the

10

1   limitations provision barred the plaintiff's contract claims, as well as claims for negligence,

2   products liability based on defects in the design of the alarm system, and breach of the duty of

3   care.  *See id.* at 128.

4        While *Corbett* did not expressly restrict its holding to a limited class of tort claims, its

5   facts, the authorities upon which it relied, and related cases suggest that under New York law, a

6   contractual limitations period typically covers tort claims only where they arise out of the parties'

7   contractual relationship.  *See Par Fait Originals v. ADT Sec. Systems, Northeast, Inc.*, 184 A.D.2d

8   472 (N.Y. App. Div. 1st Dep't 1992) (limitations period in security services contract barred claims

9   for gross negligence based on the defendant's failure to notify the police of a burglary in the

10  plaintiff's home); *Doe v. HMO-CNY*, 14 A.D.3d 102, 105 (N.Y. Ct. App. 2004) (limitations period

11  in health insurance contract barred tort claims against insurer based on its refusal to cover certain

12  medical procedures); *Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgt. Inc.*, 80 A.D.3d 293, 304

13  (N.Y. App. Div.  2010) (limitations period in investment contract barred claims for negligence and

14  breach of fiduciary duty based on the defendant's alleged mismanagement of  the plaintiff's

15  money).  This is also consistent with New York's approach to choice of law clauses, which are

16  rarely construed "to encompass extra-contractual causes of action."  *Fin. One Pub. Co. v. Lehman*

17  *Bros. Special Fin., Inc.*, 414 F.3d 325, 334 (2d Cir. 2005) (declining to apply a New York choice

18  of law provision in a securities contract to a claim that arose from an "extra-contractual source");

19  *see also Twinlab Corp. v. Paulson*, 283 A.D.2d 570, 571 (N.Y. Ct. App. Div. 2d Dep't 2001)

20  (declining to extend a choice of law provision in a consulting contract to a tort claim that was

21  "unrelated to [the defendant's] duties as a consultant").

22       Here, RSI's tort claims do not rest primarily on the existence of the developer agreement.

23  Rather, the gravamen of the TAC is that IBM misappropriated RSI's technology to develop a

24  competitive product, called that product by a confusingly similar name, and then marketed it to

25  RSI's customers while making false or disparaging statements about RSI's product.  *See* TAC ¶¶

26  25-55.  These allegations are not dependent on the parties' contractual relationship, but rather on

27  their relationship as competitors.  Furthermore, RSI does not merely seek the benefit of the

28  parties' bargain or damages of the type remedial in contract.  *Cf. Cardonet, Inc. v. IBM*, No. 06-

06637 RMW, 2007 U.S. Dist. LEXIS 14519 (N.D. Cal. Feb. 14, 2007) (finding that a New York choice of law provision in the parties' contract governs tort claims that "seek the benefit of plaintiff's bargain with [the defendant] and seek damages of the type remedial in contract under New York laws.").  In fact, injunctive relief and disgorgement of profits are explicitly unavailable in contract actions.  *See Franconero v. Universal Music Corp.*, 2011 U.S. Dist. LEXIS 15259, at *12 (S.D.N.Y. Feb. 11, 2011) ("It is well-settled that [d]isgorgement . . . is not an appropriate remedy for a breach of contract."); *Icebox-Scoops, Inc. v. Finanz St. Honore, B.V.*, 676 F. Supp. 2d 100, 116 (E.D.N.Y. 2009) (noting that injunctive relief is not available on a contract claim). Further, unlike a party to a services contract who may reasonably contemplate that the services will be deficiently performed, a licensor is less likely to consider the possibility that its licensee could develop a competing product in order to cannibalize its customer base.  As a court may not "read[] into the contract meanings not contemplated by the parties," this supports a more restrictive reading of the limitations provision.  *Jakobson Shipyard v. Aetna Casualty & Sur. Co.*, 961 F.2d 387, 389 (2d Cir. 1992).

Of course, as IBM points out, it is true that the developer agreement first brought the parties together.  It is also true that the TAC is replete with references to the contract, IBM's contractual "duty" to support or market BPT, and "proprietary information" stolen by IBM while under contract.  *See* TAC ¶¶ 25-55.  However, the court accepts RSI's assertion that such allegations were intended to "show[] that IBM is acting egregiously," not to state elements of its tort claims.  Dkt. No. 142 at 17.  The mere fact that RSI references the developer agreement in its complaint does not convert its tort claims into "breach of contract claim[s] in disguise." Dkt. No. 135 at 14.  Thus, while the court acknowledges that a contractual limitations period *could* cover tort claims under New York law, IBM has failed to show that interpreting the limitations provision to bar RSI's tort claims "is the only construction which can fairly be placed thereon."  *Arrow Communication*, 206 A.D.2d at 923.  Accordingly, IBM's motion for partial summary judgment that RSI's tort claims are barred by the two year limitations provision is denied.

**2.   Estoppel**

1    A plaintiff may equitably estop a defendant from asserting a time limitation defense only

2  under "extraordinary circumstances." *Allman v. UMG Recordings*, 530 F. Supp. 2d 602, 608

3  (S.D.N.Y. 2008) (citing *Levy v. Aaron Faber, Inc.*, 148 F.R.D. 114, 119 (S.D.N.Y. 1993)). "[T]he

4  doctrine of equitable estoppel is properly invoked only in cases 'where the plaintiff knew of the

5  existence of his cause of action but the defendant's conduct caused him to delay in bringing his

6  lawsuit.'" *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 337 (S.D.N.Y. 2003) (quoting *Cerbone

7  v. International Ladies' Garment Workers' Union*, 768 F.2d 45, 49-50 (2d Cir. 1985)).   In order to

8  establish estoppel on a motion for summary judgment, a plaintiff must "offer evidence that it was

9  misled or lulled by the defendant into failing to bring its claim in a timely manner." *N. Am.

10  Foreign Trading Corp. v. Mitsui Sumitomo Ins. USA, Inc.*, 477 F. Supp. 2d 576, 582 (S.D.N.Y.

11  2006).   Such evidence may include affirmative misrepresentations by a defendant upon which a

12  plaintiff reasonably relies in delaying legal action.  *See id.* at 582 (finding estoppel applicable

13  where an insurer misrepresented to its insured that the status of its claim was uncertain although it

14  had already determined it would be denied); *Mass v. Great American Ins. Co.*, 28 A.D.2d 897, 898

15  (N.Y. Ct. App. 1967) (finding estoppel where defendant insurer represented that the "loss would

16  be adjusted, without litigation").

17    On the record before the court, RSI fails to identify evidence showing that estoppel may

18  toll the contractual limitations period as to its claim that IBM breached the audit provision.

19  However, in its  Rule 56(d) declaration, RSI states that "no deposition has been taken pertaining to

20  IBM's request that RSI agree to extend the timeframe within which to produce information

21  pursuant to the parties' agreement with respect to the audit provision."  Dkt. No. 142-1 ¶ 21.  RSI

22  contends that a deposition could "show that IBM's representations that it would produce

23  information were false," supporting an estoppel defense.  Dkt. No. 142 at 10 n. 12.[7]  The court

24  notes that discovery in this action was largely stalled until after the parties' unsuccessful

25  mediation in October 2011, and that although RSI has not deposed a single IBM witness since

---

[7]    The court previously rejected RSI's estoppel argument with respect to the royalty
provision under *Allman v. UMG Recordings*, 530 F. Supp. 2d 602, 608 (S.D.N.Y. 2008), but
pointed out that RSI had alleged "numerous examples of IBM's delaying or frustrating RSI's
attempt to exercise its right to an audit."  Dkt. No. 81 at 4.

1   then, its failure to do so resulted in part from IBM's foot-dragging in the production of written

2   discovery.  *See, e.g.*, Dkt. No. 131 (April 13, 2012 Order Granting in Part and Denying in Part

3   RSI's Motion to Compel); Dkt. No. 164 (RSI's Motion to Compel Interrogatory Responses); Dkt.

4   No. 175 (RSI's Motion to Compel Document Production).  In this context, the court finds that RSI

5   has satisfied its burden under Rule 56(d) to identify the specific facts that further discovery would

6   reveal, and explain why those facts would preclude summary judgment.  *See* Fed. R. Civ. P. 56(d);

7   *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006).  Accordingly, as

8   explained in more detail at the end of this order, the court will delay a final ruling on the estoppel

9   issue for ninety days from the date of this order.[8]

10   **B.      STATE LAW STATUTES OF LIMITATIONS**

11         IBM next argues that RSI's claims for unfair competition and tortious interference with

12   economic advantage are barred under the three-year statutes of limitation governing such claims in

13   New York.  According to IBM, New York law applies because (1) the developer agreement

14   contains a New York choice of law provision, and (2) IBM is headquartered in New York.  RSI

15   contends that the court should instead apply New Jersey's six-year limitations periods because (1)

16   RSI is a New Jersey resident, and (2) the "situs of the wrong to RSI" occurred in that state.  Dkt.

17   No. 142 at 20.  Both parties also acknowledge that because California is the forum state,

18   California law may control.  Finally, RSI argues that IBM's motion is premature because it has

19   failed to provide discovery that is "essential" to oppose IBM's assertion that its claims are

20   untimely.  Dkt. No. 142 at 21.  The court addresses the choice of law question first.

21         **1.      Choice of law**

22         As an initial matter, the court rejects IBM's argument that the contractual choice of law

23   provision applies to RSI's tort claims.  IBM relies on *Cardonet, Inc. v. IBM*, in which this court

24   applied a similar provision to contract claims, fraud, negligent misrepresentation, unfair

25   competition, unjust enrichment, and conversion.  *See Cardonet*, 2007 U.S. Dist. LEXIS 14519 at

---

[8]      The court expresses no opinion at this time as to when RSI's claim for breach of the audit provision accrued, nor whether RSI would be able to recover damages incurred outside the limitation period for any claim that accrued after February 16, 2006.

14

*7-10.  In finding the provision applicable, the court specifically noted that "the choice-of-law provision reaches all of plaintiff's claims since the claims as pled seek the benefit of plaintiff's bargain with IBM and seek damages of the type remedial in contract under New York laws." *Id.* at * 9 (citing *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 464 (Cal. 1992)).  As discussed above, tort claims at issue here do not "emanat[e] from the agreement or the legal relationship it creates." *Id.* at 470 (finding a choice of law provision in a shareholders' agreement applicable to claims for breach of the implied covenant of good faith and fair dealing and breach of fiduciary duty).  Further, the choice of law provision by its terms suggests that it applies only to contract claims.  *See Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) ("Under New York law, a choice-of-law provision indicating that the *contract* will be governed by a certain body of law does not dispositively determine that law which will govern a claim of *fraud* arising incident to the contract.") (emphasis in original).  As RSI's tort claims fall outside the scope of the contractual choice of law provision, the court turns to a general choice of law analysis to determine which state's law governs.

"In a federal question action where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state." *Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996).  California uses a "governmental interest" approach to the choice of laws, requiring this court to proceed by following three steps:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.  Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.  Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

*McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 87-88 (Cal. 2010).

Here, there is no question that the relevant law of each jurisdiction differs.  *See Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.*, 126 Fed. Appx. 507, 509 (2d Cir. N.Y. 2005) (three-year limitations period for unfair competition claim); *Ullmannglass v Oneida, Ltd.*, 86 A.D.3d 827, 828 (N.Y. App. Div. 3d Dep't 2011) (three-year period for tortious inference claims); *Kelly v. Estate of Arnone*, No. 08-6046, 2009 U.S. Dist. LEXIS 66945, at *19 (D.N.J. Aug. 3, 2009) (six-year period for unfair competition); *In re Bernheim Litig.*, 290 B.R. 249, 258 (D.N.J. 2003) (six-year period for tortious inference); Cal. Bus. & Prof. Code, § 17208 (four-year period for unfair competition); *Knoell v. Petrovich*, 76 Cal. App. 4th 164, 168 (Cal. Ct. App. 1999) (two-year period for tortious interference).

The court therefore considers the forums' competing interests in applying their own statutes of limitations to the instant claims.  "Where the conflict concerns a statute of limitations, the governmental interest approach generally leads California courts to apply California law." *Deutsch v. Turner Corp.*, 324 F.3d 692, 716-717 (9th Cir. Cal. 2003) (citations omitted).  As the Ninth Circuit has explained, "California's interest in applying its own law is strongest when its statute of limitations is shorter than that of the foreign state, because a state has a substantial interest in preventing the prosecution in its courts of claims which it deems to be 'stale.'  Hence, subject to rare exceptions, the forum will dismiss a claim that is barred by its statute of limitations." *Id.* (citing RESTATEMENT (2D) OF CONFLICT OF LAWS § 142 (1988)).

RSI has not demonstrated that this case presents a "rare exception" warranting the application of New Jersey statutes of limitations, which are substantially longer than California's. While New Jersey has an interest in "regulating conduct that occurs within its borders," *McCann*, 48 Cal. 4th at 98, it is not clear that the conduct at issue here has any connection to New Jersey apart from the fact that RSI is a New Jersey resident.  At the same time that RSI claims New Jersey as the "situs" of IBM's alleged wrongdoing, it emphasizes that "relationships with customers and potential customers worldwide" were affected by IBM's actions and argues that "given the global scope of IBM's activities with respect to BPT and BPA, determination of what unfair competition statute(s) apply … is still premature."  Dkt. No. 142 at 19; 19 n. 19.  RSI cannot have it both ways.  Without evidence that any of the *conduct* underlying RSI's claims

occurred in New Jersey, the court rejects RSI's conclusory assertion that IBM's purported transgressions were "directed" at that state.  *Compare AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*, 726 F. Supp. 2d 307, 315 (S.D.N.Y. 2010) (applying New Jersey law to tortious interference with contract claim despite the fact that the allegedly tortious conduct occurred in various locations because the plaintiff resided in New Jersey and the contract at issue was "signed and notarized in New Jersey").  Further, even if RSI's claims "accrued" in New Jersey because RSI sustained injury there, a state's interest in "providing a remedy to … a potential plaintiff in a case in which the defendant's allegedly tortious conduct occurred in another state is less than its interest when the defendant's conduct occurred in [that state]."  *McCann*, 48 Cal. 4th at 99. Finally, although New Jersey has an interest in compensating its domiciliaries for their injuries, *see, e.g.*, *Pine v. Eli Lilly & Co.*, 201 N.J. Super. 186, 192 (N.J. App. Div. 1985), California courts generally give little weight to a plaintiff's residence in choosing the appropriate statute of limitations.  *See Ashland Chemical Co. v. Provence*, 129 Cal. App. 3d 790, 794 (Cal. Ct. App. 1982) ("Statutes of limitation are designed to protect the enacting state's residents and courts from the burdens associated with the prosecution of stale cases in which memories have faded and evidence has been lost."); *McCann*, 48 Cal. 4th at 102 (applying an Oklahoma statute of repose to a tort claim brought by a California resident).  The court thus concludes that it would be inappropriate to apply New Jersey's longer limitations periods to preserve claims that would be time-barred under California law.

The court next turns to the application of New York's statutes of limitations, one of which is longer than California's (tortious interference) and one of which is shorter (unfair competition). Although a strict interpretation of choice-of-law principles might mandate selecting the shortest limitations period for each claim, neither party cites any authority fragmenting an action in such a manner, and the court has found none.  Doing so would clearly complicate the case, undermining the forum's interest in "how its judicial machinery functions and how its court processes are administered."  RESTATEMENT (2D) OF CONFLICT OF LAWS § 122 (1988).  The court therefore declines to deviate from the "general" rule expressed in *Deutsch* requiring the application of California statutes of limitation to both of RSI's claims.

1      **2.      Timeliness of RSI's state law claims**

2            Under California law, RSI's claims for tortious interference with prospective economic

3      advantage and unfair competition are untimely if they accrued before February 18, 2006 and

4      February 18, 2004, respectively.  Generally speaking, a claim accrues at "the time when the cause

5      of action is complete with all of its elements."  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797,

6      806-807 (Cal. 2005) (citation omitted).  An important exception to the general rule is the

7      "discovery rule," which postpones accrual of a cause of action until the plaintiff discovers, or has

8      reason to discover, the cause of action.  *Id.*  A plaintiff has reason to discover a cause of action

9      when he or she "has reason at least to suspect a factual basis for its elements."  *Id.*  On a motion

10     for summary judgment, the party seeking the benefit of the of the discovery rule is required to

11     provide evidence establishing a triable issue of fact as to whether the rule applies.  *See O'Connor*

12     *v. Boeing N. Am.*, 311 F.3d 1139, 1150 (9th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S.

13     317, 323 (1986)).

14                    **i.      Misappropriation-based claim**

15           IBM first argues that RSI's claim for "misappropriation-style unfair competition"[9] accrued

16     in 2001, when IBM publicly announced the release of BPA and the withdrawal of its support for

17     BPT.  In *Opals on Ice Lingerie, Designs by Bernadette, Inc. v. BodyLines, Inc.*, 425 F. Supp. 2d

18     286, 297 (E.D.N.Y. 2004), the plaintiff alleged that the defendant misappropriated the plaintiff's

19     bra designs based on samples provided to the defendant, and then disparaged the plaintiff's

20     reputation by telling consumers that its products were superior.  The court found that the statute of

21     limitations on plaintiff's unfair competition claim began to run at "the point at which [the

22     defendant] misappropriated [the plaintiff's] designs and manufactured and sold them as its own."

23     *Id.*  Although *Opals* is a New York case, RSI cites no authority suggesting such conduct would be

24           [9]      IBM characterizes RSI's unfair competition claims as primarily "misappropriation-
25     style"—based on allegations that IBM used RSI's proprietary information in developing BPA and
       then marketed BPA to RSI's potential customers—or "Lanham Act-style"—based on allegations
26     that IBM both chose a confusingly similar name for its product and made false and disparaging
       statements about BPT to third parties.  *See* Dkt. No. 134 at 16; Dkt. No. 135 at 25.  While IBM
27     suggests that both claims are untimely under any number of theories, its briefing focuses on the
       argument that the "misappropriation-style" claim is barred by the state law statute of limitations,
28     while the "Lanham Act-style" claim is barred by laches.

18

treated differently under California law.  Further, given *Opals*' similarity to the allegations here, the court finds its reasoning persuasive.  Accordingly, the court concludes that to the extent RSI's unfair competition claim is based on the alleged misappropriation of proprietary information, it accrued in 2001.

### ii.        Claims based on other alleged misconduct

IBM next points to numerous instances of alleged misconduct identified by RSI in its interrogatory responses as supporting its state tort claims.  IBM argues that even if such claims are not barred in their entirety, partial summary judgment is appropriate if particular "bad acts" are asserted to have caused injury to RSI outside the limitations period.

Specifically, IBM identifies nine customers that were allegedly offered discounted BPT or BPA licenses, a practice that RSI asserts was intended to gain an unfair competitive advantage for IBM: (1) YKB Bank in February 2000; (2) Blue Cross/Blue Shield of Montana in April 2000; (3) AmerUs Life in July 2000; (4) Lufthansa on or about August 31, 2001; (5) CSC in or around May or June 2001; (6) CNF on or about September 7, 2001; (7) IT Austria on or about October 11, 2001; (8) Winterthur Insurance on or about April 25, 2005; and (9) Manulife Canada in or around November 2005.  *See* Dkt. No. 134 at 17-18; Morgan Decl. CLP, Ex. F at 9-13.  IBM also highlights ten instances in which customers either cancelled existing BPT licenses, declined to enter into BPT licenses, or delayed negotiations with RSI as a result of IBM's alleged misconduct. These include: (1) YKB Bank's failure to enter into a licensing agreement with RSI in February 2000; (2) Blue Cross/Blue Shield of Montana's decision not to license through RSI in April 2000; (3) the year-long delay in RSI's negotiations with AmerUs Life in July 2000; (4) Telestra's cancellation of its BPT license in mid-2001; (5) CSC's rejection of a BPT license in May or June 2001; (6) American Express' cancellation of BPT and installation of BPA in April 2004; (7) the State of Louisiana's "announcement" that it would not renew a BPT license in favor of a BPA license in May 2004; (8) Morgan Stanley Dean Witter's cancellation of its BPT license on April 22, 2005; (9) Northwestern Mutual Life's cancellation of a BPT license in favor of a BPA license in October 2005; and (10) Manulife Canada's delay in licensing BPT in or around November

2005.  *See* Morgan Decl. CLP, Ex. F at 9-20.[10]

Although it is not clear whether the identified "bad acts" support causes of action for unfair competition, tortious interference, or both, RSI does not dispute that its claims accrued on the dates identified by IBM.  Instead, it simply argues that it is entitled to further discovery in order to determine "when the various instances [of misconduct] were discovered."  Dkt. No. 142 at 21.

The court finds this argument unpersuasive.  The date on which RSI discovered an instance of alleged misconduct is a concrete piece of information within RSI's control, yet RSI makes no attempt to identify such dates in its briefing or declarations.  *Compare VISA International Service Asso. v. Bankcard Holders of America*, 784 F.2d 1472, 1476 (9th Cir.1986) (allowing additional discovery because "public confusion, the object of discovery in this case, is a broad phenomenon, the existence of which is neither easily proven nor easily disproven").  In addition, given that RSI admits to being in regular contact with all or most of the named customers, it is reasonable to infer that it knew of IBM's actions when they occurred.  This inference is supported by interrogatory responses indicating that RSI was generally aware of what IBM was doing.  *See, e.g.*, Morgan Decl., Ex. F at 12 ("On or about August 31, 2001 … RSI learned that IBM was improperly charging Lufthansa [for BPT licenses]."); *id.* at 13 ("In or around May or June 2001 … RSI's distributor was advised by a CSC representative that it did not need BPT through RSI because IBM had given them BPT free of charge.").

Furthermore, as noted above, "a party requesting a continuance pursuant to Rule [56(d)] must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment."  *Tatum*, 441 F.3d at 1100.  RSI's Rule 56(d) declaration cites a number of outstanding discovery requests, but identifies no "facts" relevant to

---

[10]   IBM also identifies Bank of New York Mellon cancellation of a BPT license in June 13, 2001.  However, RSI's interrogatory responses indicate only that Bank of New York Mellon was the target of misleading communications from IBM, not that it cancelled a BPT license.  *See* Morgan Decl., Ex. F at 9.

1   when RSI learned of the alleged bases for its tort claims.  *See* Dkt. No. 142-1 (Shultz Decl.) ¶ 3.[11]

2   In addition, as IBM's motion seeks only partial summary judgment, denying RSI's request will

3   not "foreclose" any inquiry relevant to the remaining instances of alleged misconduct occurring

4   within the limitations period.  *Compare VISA International*, 784 F.2d at 1476.

5          The court thus grants IBM's motion in part, finding that there is no issue of fact as to

6   whether the following claims are untimely: (1) the "misappropriation-style" unfair competition

7   claim; (2) other unfair competition claims based on the identified instances of misconduct that

8   occurred before February 18, 2004; and (3) tortious interference claims based on the identified

9   instances of misconduct that occurred before February 18, 2006.

10  **C.     LACHES**

11         Finally, IBM argues that RSI's Lanham Act claims, as well as the portion of its unfair

12  competition claim based on identical allegations, are barred by laches.  "Laches is an equitable

13  time limitation on a party's right to bring suit, resting on the maxim that 'one who seeks the help

14  of a court of equity must not sleep on his rights.'"  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,

15  304 F.3d 829, 835 (9th Cir. 2002) (citations omitted).    Laches is a valid defense to Lanham Act

16  and unfair competition claims.  *Id.* at 842.  A party asserting laches must show that (1) the

17  plaintiff's delay in filing suit was unreasonable, and (2) it would suffer prejudice caused by the

18  delay if the suit were to continue.  *Id.* at 838 (citing *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951

19  (9th Cir. 2001)).

20         "The limitations period for laches starts from the time the plaintiff knew or should have

21  known about its potential cause of action."  *Tillamook Country Smoker, Inc. v. Tillamook County*

22  *Creamery Ass'n,* 465 F.3d 1102, 1108 (9th Cir. 2006) (citations omitted).  Because the Lanham

---

23         [11]   Specifically, RSI seeks: (a) documents pertaining to audits and extensions of time

24  requested by IBM to conduct audits; (b) revenue received from each customer by name to whom
    IBM licensed [BPT]; (c) communications with each customer by name to whom IBM licensed

25  BPT; (d) communications with each customer by name to whom IBM licensed [BPA]; (e)
    communications concerning the choice of the name BPA; (f) internal communications within IBM

26  concerning RSI's audit requests; (g) documents regarding IBM's efforts to comply with RSI's
    audit requests; (h) documents regarding cancellation of BPT licenses issued by IBM; (i)

27  communications between IBM and current or prospective customers as to the respective attributes
    of BPT; and (j) numerous other issues. Dkt. No. 142-1 (Schultz Decl.) ¶ 3.

28

1    Act does not contain its own statute of limitations, courts first determine when the limitations

2    period expired for "the most closely analogous action under state law." *Jarrow Formulas*, 304

3    F.3d at 836.  If the plaintiff files suit within the limitations period for the analogous state action, it

4    is presumed that laches does not apply; the presumption is reversed if the plaintiff files suit after

5    the analogous limitations period has expired.  *See id.* at 838.

6         IBM asserts, and RSI does not dispute, that the "analogous" statutes of limitation are

7    California's four-year periods for unfair competition and state trademark infringement.  *See* Cal.

8    Bus. & Prof. Code § 17208; Cal. Code Civ. Proc. § 343; *ATM Express, Inc. v. ATM Express, Inc.*,

9    No. 07-1293, 2009 U.S. Dist. LEXIS 83756, at *9 (S.D. Cal. Sept. 11, 2009).  It is also undisputed

10   that the limitations period applicable to RSI's false advertising claim is California's three-year

11   fraud statute.  *See* Cal. Civ. Proc. Code § 338(d); *Jarrow Formulas*, 304 F.3d at 838.  Thus, if

12   RSI's claims for trademark infringement and false advertising accrued before February 2004 and

13   February 2005, respectively, laches is presumed to apply.

14        **1.      Accrual of RSI's Lanham Act claims**

15        RSI's trademark infringement claim is based on the allegation that IBM's use of the term

16   "Buffer Pool Analyzer" is likely to confuse potential customers as to the "origin, developer, and

17   capabilities of the Buffer Pool Tool and the Buffer Pool Analyzer."  TAC ¶ 27.  RSI's false

18   advertising claim alleges that IBM "made and continues … to make false and misleading

19   statements to third parties, disparaging RSI's goodwill and the quality and reputation of the Buffer

20   Pool Tool."  *Id.* ¶ 28.  According to RSI, the essence of such statements is that BPA is the

21   "functional equivalent" of BPT, when in fact it is an inferior product.  However, in its

22   interrogatory responses, RSI identified only one specific statement alleged to be misleading: the

23   announcement in IBM's 2001 software withdrawal letter "that BPT would be replaced by BPA."

24   Morgan Decl. CLP, Ex. F at 9.

25        RSI does not dispute that it was aware of the name of BPA and the fact that it was being

26   touted as a "replacement" for BPT in 2001.  However, it argues that its Lanham Act claims did not

27   accrue until 2005, when it discovered the "level of confusion experienced by its target customers"

28   and the "extent to which IBM was making disparaging statements."  Dkt. No. 139 at 16.  Both

1   arguments are unavailing.  For the purpose of laches, a trademark infringement claim accrues

2   when a plaintiff has actual notice of an allegedly infringing mark and knowledge that a defendant

3   is using the mark in a similar market.  *Tillamook,* 465 F.3d at 1109.  That is, the laches clock

4   begins when the plaintiff knows or should know of the "prospect of confusion," not when "the

5   likelihood of confusion loom[s] large."  *Id.* (quoting *Grupo Gigante S.A. de C.V. v. Dallo & Co.*,

6   391 F.3d 1088, 1103 (9th Cir. 2004)).  Similarly, because all of IBM's allegedly misleading

7   communications are merely variations on the theme of the 2001 announcement, the fact that RSI

8   did not become aware of the "extent" of IBM's disparagement until 2005 is irrelevant.  *See Jarrow*

9   *Formulas*, 304 F.3d at 837 ("The presumption of laches is triggered if *any* part of the claimed

10   wrongful conduct occurred beyond the limitations period.") (emphasis added);

11   *Bridgestone/Firestone Research, Inc. v. Auto. Club De L'Ouest De La France*, 245 F.3d 1359,

12   1364 (Fed. Cir. 2001) ("The theory of continuing wrong does not shelter [a defendant] from the

13   defense of laches.") (citation omitted).  As RSI knew enough to bring Lanham Act and unfair

14   competition claims in 2001, well outside the applicable limitations periods, the court presumes

15   that laches is applicable.

16        **2.**      **Reasonableness of delay**

17        Despite this presumption, IBM still bears the burden of showing that RSI's delay in filing

18   suit was unreasonable, and that IBM suffered prejudice as a result.  *Jarrow Formulas*, 304 F.3d at

19   838.  In considering whether a plaintiff's delay is reasonable, courts look to the cause of delay.

20   *Danjaq*, 263 F.3d at 954.  "Delay has been held permissible, among other reasons, when it is

21   necessitated by the exhaustion of remedies through the administrative process, when it is used to

22   evaluate and prepare a complicated claim, and when its purpose is to determine whether the scope

23   of proposed infringement will justify the cost of litigation."  *Id.* (citations and quotation marks

24   omitted).

25        Here, RSI provides no valid explanation for its nearly seven-year delay in filing suit.  First,

26   it points to the fact that when BPA was first introduced, its name was preceded by the word

27   "IBM," and was only later shortened to "mirror the name by which RSI called BPT."  Dkt. No.

28   139 at 16.  This assertion is contradicted by IBM's 2001 product announcement, which  identifies

the product simply as "DB2 Buffer Pool Analyzer for z/OS."  Mink Decl., Ex. I.  In addition, although calling the product "Buffer Pool Analyzer" rather than "DB2 Buffer Pool Analyzer for z/OS" may have slightly increased the likelihood of confusion with RSI's "Buffer Pool Tool for DB2," it does not justify waiting seven years to bring an infringement action.  This is particularly true given that RSI has insisted from the beginning that the likelihood of confusion between the two marks is a matter of "common sense."  Morgan Decl., Ex. EE at 3.

As noted above, RSI also justifies its delay by asserting that it was unaware of the "extent" of IBM's misconduct until 2005.  Because it is undisputed that RSI had enough information to bring a Lanham Act claim in 2001, such an allegation does not create a material issue of fact sufficient to avoid laches.  *See Jarrow Formulas*, 304 F.3d at 837; *Grupo Gigante*, 391 F.3d at 1103.  Furthermore, having initiated an active campaign to convince customers that BPA was *not* the functional equivalent of BPT beginning in 2001, RSI should not be able to defend its delay on the ground that it was oblivious to IBM's alleged statements to the contrary.  The court therefore finds that RSI's delay was unreasonable.

### 3.      Prejudice

The Ninth Circuit recognizes two primary forms of prejudice in the laches context: (1) expectations-based prejudice, and (2) evidentiary prejudice.  *Danjaq*, 263 F.3d at 954.  Either kind of prejudice is sufficient to support a finding of laches.  *See, e.g.*, *Jarrow Formulas*, 304 F.3d at 837 (considering only expectations-based prejudice); *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 411 (6th Cir. Mich. 2002) (noting that "*any* prejudice is sufficient, including an increase in potential damages or a loss of evidence") (emphasis in original).

A defendant may show expectations-based prejudice by producing evidence that "it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly." *Id.*  Such prejudice may arise where a defendant "invested money to expand its business or entered into business transactions based on his presumed rights."  *Miller v. Glenn Miller Prods.*, 318 F. Supp. 2d 923, 944 (C.D. Cal. 2004), *aff'd by Miller v. Glenn Miller Prods.*, 454 F.3d 975 (9th Cir. 2006) (granting summary judgment for defendant that invested significant amount of time and money in developing its merchandising program, cultivating a market for its product, and forming

relationships with sub-licensees throughout the world); *cf Danjaq*, 263 F.3d at 954 (upholding laches bar to copyright infringement case based on the defendant's "uncontested evidence that it invested approximately one billion dollars in the development, production, marketing, [and] distribution of the [allegedly infringing] movies").  The fact that a defendant continues to engage in its existing practices, thus incurring additional potential liability as a result of the plaintiff's delay, may also demonstrate prejudice.  *See Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. 1984); *ExperExchange, Inc. v. Doculex, Inc.*, No. 08-03875 JCS, 2009 U.S. Dist. LEXIS 112411, at *64 (N.D. Cal. Nov. 16, 2009) ("It is undisputed that DocuLex continued to incorporate Plaintiff's RTK software into its products, many of which Plaintiff now alleges are infringing.  Thus, the delay has prejudiced DocuLex by increasing the potential liability it faces with respect to these products.").

Here, it is not disputed that IBM released seven different versions of BPA between 2001 and 2010, earning ████████████████████ in licensing revenues.  *See* Mink. Decl. COA ¶ 22; Tiffany Decl. ¶ 2-3.  Further, IBM has incorporated BPA functionality into other products, generating an additional ████████ in revenues.  *See* Mink Decl. ¶¶ 23-27; Tiffany Decl. ¶ 3. RSI seeks damages based on the profits generated by IBM on both standalone BPA licenses and sales of the aggregate products.  *See* Morgan Decl. COA, Ex. OO at 3.  Had RSI raised a challenge to IBM's use of the BPA name or its alleged marketing practices earlier, IBM would have had an opportunity to change course, substantially reducing its potential liability.  The court thus finds that IBM has demonstrated prejudice as a result of RSI's delay.

RSI argues that IBM cannot show prejudice because it has "done nothing to develop recognition of the BPA name" or associate it with the IBM brand.  Dkt. No. 139 at 12.  RSI relies on *Internet Specialties West, Inc. v. Milon-Digiorgio Enters.*, 559 F.3d 985, 992 (9th Cir. 2009), which considered whether laches could bar a trademark claim where the defendant "typically did not even include the [allegedly infringing mark] in [its] advertisements."  Noting that laches is meant to "protect an infringer whose efforts have been aimed at build[ing] a valuable business *around its trademark*," the Court of Appeal upheld the district court's rejection of a laches defense.  *Id.* (emphasis in original; citation omitted).

1    *Internet Specialties* is distinguishable from the instant case in two important respects.

2    First, while the use of the infringing mark by the junior user in *Internet Specialties* was virtually

3    invisible, RSI has expressly argued that IBM *emphasized* the BPA name in its marketing materials

4    order to capitalize on BPT's goodwill.  *See* Dkt. No. 139 at 5.  Second, *Internet Specialties*

5    concerned only a claim for injunctive relief, not damages.  Therefore, the possibility that the

6    defendant might incur increased liability as a result of the plaintiff's delay—the primary form of

7    prejudice raised by IBM—was simply not an issue in that case.  The court thus finds that *Internet*

8    *Specialties* is inapposite, and concludes that IBM has met its burden to show prejudice.

9            **4.    *E-Systems* factors**

10          In addition to the factors addressed above, courts considering a laches defense to a

11   trademark infringement claim are also instructed to consider: "1) the strength and value of

12   trademark rights asserted; 2) plaintiff's diligence in enforcing mark; 3) harm to senior user if relief

13   denied; 4) good faith ignorance by junior users; 5) competition between senior and junior users;

14   and 6) extent of harm suffered by junior user because of senior user's delay."  *E-Systems, Inc. v.*

15   *Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983).

16          The fourth and sixth *E-systems* factors overlap with the court's discussion of willfulness

17   and prejudice.  Thus, the court finds that each weighs in favor of laches.  Of the remaining four

18   factors, the court concludes that two support a finding of laches, while two do not.

19                  **i.      Factors supporting laches**

20                  **(I)      The strength and value of the plaintiff's marks**

21           "Trademark law offers greater protection to marks that are 'strong,' i.e., distinctive.  The

22   strength of a mark is determined by its placement on a continuum of marks from 'generic,'

23   afforded no protection; through 'descriptive' or 'suggestive,' given moderate protection; to

24   'arbitrary' or 'fanciful' awarded maximum protection."  *E. & J. Gallo Winery v. Gallo Cattle Co.*,

25   967 F.2d 1280, 1291 (9th Cir. 1992) (citations omitted).  In analyzing the strength of a mark, the

26   court must evaluate the "name as a whole, rather than looking to its constituent parts individually."

27   *Committee for Idaho's High Desert v. Yost*, 92 F.3d 814, 821 (9th Cir. 1996).

28          Considering the "Buffer Pool Tool" mark as a whole, the court concludes that it is, at best,

descriptive.  "Descriptive marks define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood."  *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n. 8 (9th Cir. 1998).  For example, the Ninth Circuit has explained that "'Honey Baked Ham" is a descriptive term for a ham that has been baked with honey and 'Honey Roast' is a descriptive term for nuts that have been roasted with honey."  *Id.* Here, RSI appears to concede that "buffer pool" is a generic term for "a group of memory or storage-device locations that are allocated for temporary storage especially during transfer operations."  Morgan Decl. COA, Ex. B.  In combination with the word "tool," it takes little imagination to understand that the mark "Buffer Pool Tool" refers to an apparatus for managing buffer pools.

As RSI points out, "advertising expenditures can transform a [weak] mark into a strong mark, where … that mark has achieved actual marketplace recognition."  *Brookfield Communs. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999).  In his declaration, Joel Goldstein states that since 1995, RSI has spent $1.5 million advertising BPT in trade journals, regularly attended conferences at which BPT was discussed, and created a marketing video to educate executives about puffer pool tuning.  Goldstein Decl. ¶¶ 7-12.  RSI's expert, Martin Hubel, states that in 2001, BPT was recognized as the leading puffer pool tuning software and was associated with both the "Buffer Pool Tool" name and RST.  Hubel Decl. ¶ 12.  While a declaration from a trademark plaintiff has "little probative value regarding the assessment of [secondary meaning]" the court gives weight to Mr. Hubel's uncontroverted declaration and finds that the BPT mark has acquired at least *some* actual marketplace recognition.  Nevertheless, because such evidence is slight, the mark is entitled to only limited protection. [12]

### (II)      Plaintiff's diligence in enforcing the mark

RSI has not diligently enforced the BPT mark since its registration in 1997.  Although it is admittedly aware that another entity, ESAI, has a competitive product on the market called

---

[12]   RSI argues that its mark has been registered for more than five years, it is incontestable. *See* 15 U.S.C. § 1065.  While the court agrees, BPT's incontestability "does not establish … that it is a particularly strong mark."  *Miss World (UK), Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988).

"BPA4DB2" or "Buffer Pool Analyzer for DB2," RSI concedes that the only actions it has taken to police its mark have been directed at IBM.  *See* Morgan Decl. COA, Exs. S, V, W, EE at 32.  In addition, RSI continued to do business with IBM for seven years after the introduction of BPA without ever indicating it was "troubled by the similarity in the marks."  *American Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 834 (9th Cir. 1991) (Kozinski, J., dissenting) (noting that this factor favored a defendant that openly used the mark for five years and did business with the plaintiff).  This factor therefore weighs in favor of laches.

### ii.      Factors weighing against the application of laches

### (I)      Competition between users

It is undisputed that RSI and IBM compete for customers in the DB2 tools market.  The parties also agree that such customers "fall within a relatively small category of large businesses."  Goldstein Decl. CLP. ¶ 4.  As both companies hope to license similar products to the same companies in the same market, this factor plainly weighs against a finding of laches.  *See Grupo Gigante*, 391 F.3d at 1104 ("They both sell groceries to a very broad customer base in close proximity to one another.  Thus, this factor weighs in [the plaintiff's] favor.").

### (II)      Harm to senior user if relief is denied

The question of whether a senior user will be harmed if relief is denied turns largely on the court's analysis of the likelihood of confusion.  *See Grupo Gigante*, 391 F.3d at 1103 (considering likelihood of confusion under the third *E-Systems* factor).  Here, RSI has at least raised an issue of fact as to whether consumers are likely to be confused as to the source of BPT or BPA.  RSI submitted evidence of actual customer confusion, including five emails from prospective or current customers, as well as declarations from Joel Goldstein and RSI sales representatives indicating that more than thirty customers have expressed confusion.  RSI also produced several emails evidencing confusion within IBM.  "Evidence of actual confusion constitutes persuasive proof that future confusion is likely."  *Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002) (citation omitted); *see also Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 509 (9th Cir. 2011) (considering testimony that the plaintiff's sales offices received phone calls from confused customers evidence of actual confusion).  The plain similarity between the terms "Buffer Pool

Tool" and "Buffer Pool Analyzer" also demonstrates a likelihood of confusion.  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000) ("Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion.").  Finally, RSI submitted declarations stating that while the users of DB2 software are tech-savvy and likely to know the difference between BPT and BPA, most purchasers, including managers and administrators, do not.  "So long as the reasonably prudent *purchaser* [is] likely to be confused between the marks, the trademark owner has a right … to bring an infringement claim." *Tillamook Country Smoker*, 465 F.3d at 1112-1113 (emphasis added).

IBM argues that RSI's evidence of actual confusion is *de minimus*.  To withstand a motion for summary judgment, a plaintiff must produce evidence that an "appreciable number" of people are confused about the source of the product.  *Thane Int'l.*, 305 F.3d at 902 (quoting *Entrepreneur Media v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002)).  While the court agrees that RSI's evidence—particularly declarations from salespeople who do not identify customers by name—is somewhat weak, emails from five customers and Goldstein's identification of numerous specific clients who expressed confusion supports a finding that future confusion is likely.  *See, e.g., Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F. Supp. 2d 1271, 1279 (C.D. Cal. 2008) (finding four instances of actual confusion weighed in favor of finding a likelihood of confusion but giving this factor little weight" in light of the small number of examples).  Indeed, as IBM emphasizes that DB2 software is sold to a "relatively small base" of customers, Dkt. No. 135 at 23, the fact that somewhere between five and thirty customers have expressed confusion takes on more significance.  *Compare George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 399 (4th Cir. 2009) (finding four instances of confusion *de minimus* where plaintiff sold 500,000 units per year).

IBM also argues that any confusion between BPA and BPT stems from the fact that both include the generic term "buffer pool."  As "it is proper to discount the similarity of generic parts of conflicting marks," the court agrees that the prevalence of a generic term in both marks weakens RSI's position.  4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:49 (4TH ED.).  IBM also attributes much of the confusion to the fact that it has *legitimately* licensed BPT

1  under the name "DB2 Buffer Pool Tool" for more than a decade.  Finally, IBM submitted a

2  declaration indicating that purchasers of DB2 tools are "sophisticated … IT professionals" whose

3  likelihood of confusion between BPA and BPT is "close to zero."  Mink Decl. ¶ 32.  However, as

4  this directly contradicts the declarations of RSI's witnesses, the degree of customer sophistication

5  presents a factual issue.  Accordingly, while the court considers this issue a close call, it cannot

6  conclude as a matter of law that there is no likelihood of confusion concerning the source of BPA

7  and BPT.

8              **iii.    Remedy**

9              The fact that there are considerations both supporting and weighing against the application

10  of laches does not end the court's analysis.  "Establishing a likelihood of confusion does not

11  automatically defeat a laches defense."  *Grupo Gigante*, 391 F.3d at 1104 (upholding a laches

12  defense even where one factor weighed "heavily" in the plaintiff's favor and another was a "close

13  one").  Rather, where there is a significant likelihood of confusion but the defendant shows

14  prejudice from the plaintiff's unreasonable delay, courts often strike a middle ground, allowing

15  claims for injunctive relief to proceed but barring claims for damages.  *See, e.g.*, *Kason Indus. v.*

16  *Component Hardware Group*, 120 F.3d 1199, 1207 (11th Cir. 1997); *University of Pittsburgh v.*

17  *Champion Products, Inc.*, 686 F.2d 1040, 1044 (3d Cir. 1982) (describing the "much more

18  common situation in which the plaintiff's less egregious delay will bar its claim for an accounting

19  for past infringement but not for prospective injunctive relief.").  Ultimately, "the equitable nature

20  of estoppel by laches must be foremost in the court's mind."  *Kason*, 120 F.3d at 1207.

21              Here, allowing monetary recovery will substantially prejudice IBM, which has generated

22  significant revenues—and thus increased its potential for liability—as a consequence of RSI's

23  unreasonable delay.  However, no similar prejudice would result from an injunction requiring IBM

24  to change the name of its buffer pool tuning software.  Although there is some evidence of IBM's

25  investment in the BPA name, the product is generally distributed as part of a bundle of DB2

26  products, which themselves are but a small piece of the IBM empire.  Thus, it does not appear that

27  IBM has "buil[t] a valuable business around its trademark."  *Grupo Gigante*, 391 F.3d at 1105

28  (upholding denial of injunctive relief on laches grounds).  Furthermore, given the factual issues

1   surrounding the likelihood of confusion, precluding the possibility of an injunction at this stage in

2   the litigation may harm consumers, who bear no responsibility for RSI's delay in filing suit.  *See*

3   RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 31 (1995) ("[B]ecause of the public interest in

4   preventing the deception of consumers, delay by the trademark owner will not ordinarily disable it

5   from obtaining an injunction if there is strong evidence of likely or actual confusion.").  Therefore,

6   the court tentatively holds that laches bars RSI's claims for damages, but not its claim for

7   injunctive relief.

8        **5.    Willful Infringement**

9        While the court is inclined to find RSI's trademark claim for damages barred by laches,

10  RSI last argues that IBM willfully infringed the BPT mark, precluding a laches defense.  *See*

11  *Danjaq*, 263 F.3d at 956 ("Laches does not bar a suit against a deliberate infringer.").  In order to

12  show willfulness, a plaintiff must establish that the defendant knew that it was engaging in

13  trademark infringement.  *See id.* at 957.  This burden is a "heavy" one.  *Conan Properties, Inc. v.*

14  *Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985).  To foreclose the laches defense, a plaintiff

15  must offer evidence demonstrating that the defendant "employed the allegedly infringing mark

16  with the wrongful intent of capitalizing on its goodwill."  *Id.*; *Morgan Creek Productions, Inc. v.*

17  *Capital Cities/ABC, Inc.*, No. 89-5463, 1991 U.S. Dist. LEXIS 20564, at *24 (C.D. Cal. Oct. 28,

18  1991) ("The fact that ABC picked up THE YOUNG RIDERS as a series and gave it its name after

19  the tremendous success of YOUNG GUNS could be construed as evidence of improper intent.").

20       RSI has not yet provided sufficient evidence to create a factual issue as to willful

21  infringement.  However, in its Rule 56(d) declaration, RSI complains that because the string of

22  internal IBM emails discussing prospective names for BPA was "recently produced," RSI has not

23  had an opportunity to seek more information from the "nine individuals identified in that

24  correspondence."  Dkt. No. 141 ¶ 11.  RSI also notes that it has been unable to depose an IBM

25  employee who made the following statement in an interrogatory response: "Having heard no

26  complaints from RSI despite IBM's continued public use of the DB2 Puffer Pool Analyzer mark,

27  IBM ultimately elected to aggregate [BPA] with other functionality to create other product

28  offerings."  *See id.* ¶ 29-30.  RSI argues that further discovery in these two areas could reveal that

1  IBM chose a confusingly similar name with the intent of confusing DB2 customers, supporting a

2  claim of willful infringement.  As discussed above with respect to estoppel, the court finds RSI's

3  Rule 56(d) declaration sufficient to justify delaying a final ruling on laches for ninety days from

4  the date of this order.

5  **D.        RULE 56(D) CONTINUANCE**

6         Accordingly, the court grants a ninety-day continuance to allow RSI to attempt to discover

7  further evidence concerning the issues of willful infringement and estoppel.  RSI may submit a

8  supplemental brief of no more than ten pages on these two issues within ninety days of the date of

9  this order.  If RSI files such a brief, IBM may respond with a brief no longer than ten pages within

10  ten days of the date of RSI's filing.  The court will consider any such briefing, and will either

11  adopt or modify this order with respect to those two issues *only*.  Unless the court requests a

12  hearing, the matter will be submitted on the papers.

13         It is so ordered.

14  DATED:  July 26, 2012

15

16  _____

17  Ronald M. Whyte
    United States District Judge

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28